May it please the Court, Tara Borrelli appearing on behalf of the plaintiffs' appellants. I'd like to reserve five minutes for rebuttal. I'm going to begin by picking up on a note from the prior argument, which has to do with an argument made by the intervener in this case, counsel for governor in that case, about the fact that the marriage ban is critical because this is about sending a message to different-sex parents and to different-sex fathers, and that that sets a very important social norm. I think Windsor answers that argument very powerfully. There's only one message sent by an exclusion of same-sex couples from marriage, and it's the message of indignity and stigma sent by an exclusion that's class-based and that says that these families are inferior. Nevada's marriage ban also stigmatizes and particularly demeans the children of same-sex couples. As Windsor said, these kinds of exclusions humiliate children. It tells them that they come from the wrong kind of family and that their families aren't real like every other family. As Justice Kennedy said, it makes it more difficult for them to understand the integrity and the closeness of their own family and its concord with all other families in the community. I'd also like to pick up on an argument. I don't think that's true. Ginsburg I understand Adolf's argument. I would agree with that. I would say yes, that's true. We are sending a message that the same, the heterosexual marriages are superior and that necessarily entails that this is inferior. But he would say, and we're entitled to do that. And Windsor says otherwise, Your Honor. I think Windsor makes very clear marriage is not inherently defined by the sex or the sexual orientation of the spouses. And it also makes crystal clear that same-sex couples can share equally in the dignity and the attributes of marriage. A related argument that the intervener has made in this case has to do with the claim of deinstitutionalization, as the intervener put it in the briefs. And I have to say respectfully, this is really no different than what Justice Ginsburg was confronted with in the United States v. Virginia, where in that case very similar claims were made about the idea of allowing women to attend the Virginia Military Institute. In fact, in very similar terms, the arguments by Virginia were that it would radically transform the aversive system of education, that it would destroy that system for men. And she said, we've seen these claims before. We saw them when women were going to be admitted to the bar and when they were going to be allowed to study medicine. And she knew not to credit them there, and the Court shouldn't credit them here. Put another way, the intervener has claimed that allowing same-sex couples to marry will somehow deinstitutionalize or suppress the meaning of marriage. But to take one example, same-sex couples are parents to children today in Nevada. Thousands of parents are raising children, and that doesn't in any way suppress what it means for different-sex couples to parent their children. It simply has no effect. Turning to the idea of gender complementarity that was raised in the last argument. Are you suggesting that all women's schools are unconstitutional? Or are you just saying that the State can't sponsor all women's schools? The answer is that they have to be. That any sort of classification that's a gender-based classification has to be subjected to heightened scrutiny. There was language in the United States v. Virginia about the sexes not being fungible, for example. That's a pretty long answer. I really just wanted to know whether all women's schools are evil, unconstitutional. What does Justice Ginsburg think about all women's schools? Well, I'm not sure I can tell you what she thinks. But what she made clear is that any sex-based classification, without exception, must be subjected to heightened scrutiny. That must happen here. And, Your Honors, we would urge the Court to reach the question of sex discrimination and to rule on that claim. Turning to an observation that Judge Berzon made about the fact that not many decisions, although a few, not many decisions have picked up on this argument. If you look at the decisions that have actually reached the question and have declined to rule on that basis, what they have tended to do is simply note the fact of equal application and stop there. That's the argument that this can't be sex discrimination. I didn't hear what words you said. Equal what? Equal application. Right. And the notion that both men and women are precluded. Correct. But not looking at individuals. That's exactly right. And, in fact, the cases tell us that the protection of the Fourteenth Amendment does indeed belong to the individual. It's the phrasing of the amendment itself. And Loving itself rejected the idea that equal application, which of course was argued in that case as well, is sufficient to defeat a claim for either race-based discrimination or, here, sex-based classifications. What Loving said was the fact of equal application does not immunize the statute. The argument that is sometimes raised on the other side, then, is, yes, but that was all about white supremacy. The mode of analysis there was really cabined to racial classifications. But we know that's not true because Loving also told us that, in fact, its mode of analysis was transcendent. And here's what it said. This law would be no less repugnant to the Fourteenth Amendment, even assuming an evenhanded State purpose, to protect the integrity of all races. And, in fact, we can also look at the decision in JEB v. Alabama, where the Court struck down the ability to use sex-based peremptory strikes. And, of course, it did so even though that practice doesn't adhere to the greater advantage or disadvantage of women or men as a whole. And so that tells us again that the protection belongs to the individual. We're also dealing with clearly stereotypes. Kagan. Plus there's a whole strain of Title VII law which is essentially the same. That's right. And, in fact, the EEOC itself has started to issue decisions recognizing that, indeed, discrimination against same-sex couples can be understood in two different ways as sex-based discrimination. But formally, if Beverly Sevick or Ben, she could marry her one true love, but simply because she's Beverly, she cannot. But there's nothing about her sex that relates to her ability to be an equally devoted and loving spouse. And, of course, there's also stereotype notions that are the underpinning for the exclusion of same-sex couples, and respectfully, we would submit that the interviewer's papers in this case are rife with them. I also want to talk a little bit about the idea that this is just a cautious response to a problem. As the Court said, there were crystal balls in loving as well. And I think that transcendent analysis really should inform what the Court should do in this case, too. Arguments about children and parenting were pressed to the Court in Loving, and they saw them as a distraction and rejected them there. But perhaps even more importantly, the very same arguments were raised in Windsor. The BLAG, Bipartisan Legal Advisory Group, that defended DOMA, raised arguments, the same ones, about procreation and about the welfare of children. And Windsor tells lower courts exactly how much weight to give those interests, and that is zero, because one does not affect the other. Allowing loving, committed same-sex couples to marry in the State of Nevada will have absolutely no effect whatsoever on the children of different sex couples. They don't have any greater benefits. It doesn't change who's a parent. There just is no connection whatsoever. I also want to talk about a question that was raised earlier. Kennedy. Well, doesn't it send a message, as your opponent says, to the public that the State does not believe that it's important to have a male and a female parent? Windsor rejects that notion. That very argument was pressed vigorously to the Court, that DOMA was a law that should be understood as merely a reaffirmation that different sex couples should raise their children in marriage. And Windsor saw very clearly that there was only one effect of a law like DOMA, and the same is true of this marriage amendment as well. The only effect is to exclude same-sex couples. It has no effect on different sex couples. It creates no greater incentive. In fact, the only way that you can actually get there is to do what the district court decision did in this case. This was a pre-Windsor, pre-Smithkline decision, and what the Court accepted as an appropriate rationale was the idea that if same-sex couples could marry, heterosexuals might cease to value the institution as highly, and fewer of them would enter into the institution. And we have to really unmask this for what it is. It's a view of same-sex couples. That's a different argument, I think, than the one counsel is making today. He's not saying that it will have an effect on who marries and who doesn't. He's saying it will send a message to children and to people in general that there is not an advantage to children being raised by one male and one female. He says that's the message that the ruling would have, and the State of Idaho believes that there is an advantage to being raised by one male and one female. Now, that's not even a legitimate government interest, I don't think, in any State. Nevada's own law, however, really lays this bare and makes it completely clear. The State has absolutely no interest in treating same-sex couples any differently as parents, because it already allows them to access every parental right and responsibility through registered domestic partnership. So that cannot be the State interest, because that is the opposite of what Nevada does. But in any event, just take it. It doesn't give them the same right. It recognizes, unlike Idaho, halfway there. And it omits an important half. The important half is what we're here about, which is the State recognizing the benefits and dignity of a person having a marriage. It denies that on the ground, at least in the first instance, the Idaho instance. It denies that on the ground, that it sends a message that being raised by one person from each sex is an important factor. And the way that society wants children to be raised, that it interferes with what Idaho considers the bonding relationship between a father and a mother, the child's relationship with each. The Council says that Idaho believes that that's an important facet of society to have the child have a mother and a father. There are two responses, Your Honor. The first one is, what does excluding same-sex couples from marriage have to do with that? As the Tenth Circuit found, it is wholly illogical to believe that allowing same-sex couples to marry will have any effect whatsoever on the most profound, life-altering, intimate decisions of a lifetime that heterosexuals make together about marriage and about children. I think the intervener has also put this another way in its papers, saying that, well, what this will do is suppress the meaning of marriage and, therefore, send this message and potentially discourage different-sex couples. But when women got the right to vote and when women got the right to serve on juries, that did not suppress what it meant for men to vote or for men to serve on juries either. Your Honor, if I may, I'll reserve the balance of my time. May I ask you one question, which won't take out of your time? Are you taking any position on the right of the organization here to intervene and participate in this proceeding? We're not aware of any Article III barrier to having them participate and present arguments and briefs at this stage, and it seems consistent with what happened in Windsor, where the parties were aligned in that way as well. Blagg was permitted to argue and present briefs, even though the Court accepted the cert petition of the United States. So we're not aware. Now, the law is crystal clear, and this is Hollingsworth, that the intervener certainly could not petition for cert. They have no standing to do that. And so in this case, if the Court were to rule for the plaintiffs, no stay would be appropriate because there is no party any longer left defending who could properly petition for cert. We can have that argument later after we've made a decision. But you have no disagreement that they have to have the opportunity under the law to participate in this proceeding? At this specific stage, correct, Your Honor. Thank you. Thank you. The coalition agrees fully with Ms. Borelli's brilliant analysis of the Article III issue and our position here, bringing the necessary concrete adverseness to this momentous issue. Can I just ask a miniscule question, which is, when you intervened, you were intervening as a right? Is that right? Well, we interviewed under both subsections of Rule 24. And nobody really ever had to decide because it was stipulated to? Is that right? Well, actually, the plaintiffs initially filed an objection to it, but they later withdrew that. The Court entered its order, and we have been a first-class party in this proceeding ever since. And for present purposes, it doesn't matter whether it's permissive or as a right? No, for the reasons both parties agreed upon in their letter briefing. I'd like to go to a key point where I do disagree with Ms. Borelli. She said that the blag in Windsor did not raise or did raise essentially the same argument that Idaho is raising here. And that is the case. And I would say that they did raise the same argument as the proposed student of all of them. But now on Nevada, we're on Nevada. Did I just say Idaho? Yes. I'm a fourth generation Nevada, and I'm going to switch gears right now. Nevada. Thank you. Why is blag? Did you say blag? BLG. The. Them. Okay. Who's blag? I'm sorry. It is bilateral. Oh, my word. One more time. Bipartisan legal advisory group. It basically the House of Representatives said we want Doma defended. And so they did it through this appendage of the House of Representatives. I've always assumed. And I knew blag was the House, but I didn't know it was bipartisan. Well. First time. There are a lot of Democrats in the House of Representatives who would do that, too. But the House, through its own procedures, had this appendage of the House. Do what it did in the Supreme Court. Let it participate fully. No. I know. I know. I know the House talked about it. And the court allowed it to participate. But that's the only thing. I wasn't aware it was bipartisan. Right. Well, I think I do, though, have something important to say about this point of what did blag present and what it did not present. As a close student of blag's presentation, it did not present the social institutional defense that the coalition is advancing on behalf of Nevada's marriage laws. It did not. But I think had it done so, it still would not have succeeded because of an insight Justice Kennedy had. And that insight was the power to define marriage constitutionally and practically resides in the states. Once a state, in that case New York, decided to lay down the first stick and pick up the second stick, as New York had every right to do, at that moment, federal law had no constitutional authority to try to thwart that, that is, to preserve the first stick, to preserve the man-woman marriage institution because as a practical matter, once New York picked up that second stick, it doomed the man-woman marriage institution in New York and its message, doomed is too strong, I take that back, it undermined significantly, it undermined significantly the man-woman marriage institution and its important message that we refer to in short as the child's bonding right. But, but, Idaho still has full constitutional and practical power to preserve that institution. Counsel, when you say Idaho, I'm sorry, Nevada. This is a lesson to all counsel, not to do back-to-back arguments like this. Nevada, thank you. But you've noted, no doubt, the similarity between the defenses raised by the coalition. In that regard, there may be a similarity in the defenses, but there's not that much similarity in the actual laws of the two States, because Nevada, Idaho is at least consistent about this view that you, is at least consistent about this view that you've been arguing, and Nevada seems to be completely inconsistent because it, is that so? Here, it is not inconsistency. It is the function of a robust, serious, and intellectually serious debate. You know, the great champion, one of the great champions of gender... What I mean is that Nevada... Has a full, complete... And recognizes these, these unions for many purposes. And Nevada has a full, complete domestic partnership act. Absolutely, it does. But you have to understand that the question is, the debate is, does having a DPA weaken the man-woman marriage institution, the marriage institution? Well, then that would down... I know you're not arguing the Idaho case now, but then that makes the Idaho rule seem completely overdone, because if it can achieve the same thing by simply, by the lesser restrictions that Nevada has, then why is it going so full-bore? I think I can resolve quickly this apparent, but not real, inconsistency. You have people who are great champions, like Jonathan Rauch, of genderless marriage. They said, don't do civil unions. They weaken the marriage institution. And a great champion of man-woman marriage, like Lynn Wardle, said, Jonathan's right. Don't do it. But then on the other side, you had great champions of genderless marriage. We quoted Bladgett, Professor Bladgett, as saying, no, it's not going to hurt the marriage institution. And you had people like George Bush, who was... George W. Bush was very strong in favor of man-woman marriage, who said, no, it's not going to hurt the institution. So you had people of good faith and keen intellect on both sides debating that issue. Nevada made one policy decision. Idaho made the other policy decision. They each had the right to make that policy decision. Idaho's decision with its marriage amendment to preclude domestic partnership acts or civil unions was consistent with its view that it's got to strengthen its relatively strong man-woman marriage culture. Nevada took the view of many that, no, we can have our Nevada marriage law sustaining man-woman marriage and not injure that institution by having a domestic partnership act. That was their policy choice. Is anyone able to say with any definitive ability that one policy decision is right and the other one is wrong on that key issue? That's why it's left to the democratic process. As has happened in Nevada, as is continuing to happen in Nevada, I think that for this court to take the decision of marriage away from Nevada legislators and, of course, the voters of Nevada, well, it's certainly not consistent with the message of Schuette. Counsel, Judge Sewell, if I could ask you a question, please, on the theory here for your clients. If I'm correct, it seems to me we have circuit precedent that says that sexual orientation classifications are suspect and invoke a higher scrutiny. So if I'm right in that, putting aside what you could argue to the Supreme Court or an en banc court, our panel is required to apply heightened scrutiny, and the question is, do the state's justifications here asserted directly in the Idaho case or by the intervener in this case meet heightened scrutiny? Am I right on that? Yeah, I think you articulated the issue well, and you have the plaintiff's reading and you have the coalition's reading of Smith-Kline. We have briefed that thoroughly on both sides. We stand by our reading of Smith-Kline. Does it call for heightened scrutiny? Yes, it calls for Windsor heightened scrutiny, if you want to use that phrase, which, because Windsor was an anonymous case, applies, anonymous cases. We have said this is not an anonymous case. The indicia of anonymous that the quadrilogy has spelled out for us, it just doesn't apply here. And so then you're back to standard rational basis review. But I think most important for us, Nevada's good reason for choosing to pick up the first stick is constitutionally good and withstand scrutiny under any level of scrutiny, and that is not bravado. That includes strict scrutiny, because we believe that the State wants to send messages, isn't the way to send a message by sending a message? I.e., I mean, that's essentially what at least the original abortion cases said. You know, you can't ban abortions, but if you want to go around putting up a billboard saying abortions are bad, go ahead and do it. A billboard saying, dads, if you're going to make a baby, create a stable and enduring relationship. If you put up that billboard, that is a lightning bug. And institutionalized meaning is lightning. It's so much more powerful. It is so much more powerful. And what good is a billboard when the State suddenly withdraws all official and public support for the child's bonding right? They're not withdrawing any public support. They're providing the same benefits that they're providing now to the same marriages. Yes, but the DPA is clear. And this is why so many genderless marriage applicants are so opposed to the very notion of DPAs. They think they do something other than what changing to a genderless marriage regime would do in terms of all of the interests at stake. I'm sorry. I didn't hear that. Well, that was a little convoluted. Let me try it this way. No, I literally didn't hear it. It's not that I didn't understand it. Oh, okay. Excuse me. I didn't hear it. The DPA says expressly that a DPA, excuse me, about a domestic partnership is not marriage. It makes that clear. That is protective of marriage as a marriage institution, as a social institution. We've already talked about the policy debate as to whether it's sufficiently protective or insufficiently protective. But that was Nevada's choice, and Nevada had a right to make that choice. Look, institutionalized meanings matter. That's the core message. That's why Nevada, the coalition, they would see a 2% or 3% or 4% increase in fatherlessness as a great, great tragedy. A great tragedy. And to avoid that would certainly qualify as a compelling governmental interest. Does anybody have a crystal ball to say what the change in meanings, core meanings, will mean for the level of fatherlessness over the decades to come? Of course nobody has a crystal ball. How would it increase fatherlessness? Are these children that wouldn't be born or children that would be born? And what would their situation be? They would be raised by a single mother. They may be raised... No, no, I don't mean if we allow gay marriage. I mean if we don't allow gay marriage, where are these 3% or 4%? No, the 3% or 4% I was talking about was in the event there's a genderless marriage regime with its new message, and it has the effect of increasing the level of fatherlessness. But if we don't have that regime, does that mean that 3% or 4% won't be born? Or does it mean something different won't happen to them? No, we believe that this great, strong social expectation that we call the child's bonding right, we think it is effective. It's certainly effective in Idaho, relatively speaking. And we think that when... This isn't about whether children will be born or not. It's a question about when they are born, will they know and be raised by the 2 people who brought them into this world and whose family and biological heritage are a key part of their very being? I still don't understand. The same number of children will be born, you say, whether you have gay marriage or not? Neither the coalition nor... Let me answer it this way. That is not an issue or a concern. People haven't focused on that, haven't thought about that, haven't argued whether we're going to have an increase or a decrease in the birth rate. That's not what we're arguing. No, but you said 3 or 4 percent of fatherless children will exist. And I don't know where you get that 3 or 4 percent. But I wonder, who are those children? Are those children... Is the rate going to be less because there are going to be fewer children? Or is it going to be less because there will be the same number of children, but they'll somehow not be raised by heterosexual couples? What is it that we're concerned about? We are concerned about children who are born being deprived of the child's bonding right, not having it honored and lived in their own lives. Judge Posner, in his opinion, spent a lot of time on adoptive children. Yes. And the fact that one of the things you're doing here is, I mean, a fair number of gay couples adopt children, so you're going to have either fewer adoptive parents or you're going to have discredited adoptive parents. And what about them? Well, first of all, both Idaho and Nevada allow qualified gay couples to adopt. Yes, that's right. In second-rate families. Well, you know, we do not readily accept that rhetoric. We have explained our reason. But you do. That's the whole point of your rhetoric. It's to give a message that they're second-rate families. No, absolutely not. And I disagree with that strongly, Your Honor. We have said repeatedly this is not about comparing the quality of parenting going on in same-sex couple households compared to married couple households. But you're sending a message that these are less desirable families. That is what you're doing. That is what you say you're doing anyway. That message was engrafted on the marriage institution just in the last dozen years or so by genderless marriage advocates. Chief Justice Roberts said this, and this is an oral argument, I think, to Ted Olson. When the institution of marriage developed historically, people didn't get around and say, let's have this institution, but let's keep out homosexuals. The institution developed to serve purposes that, by their nature, didn't include homosexual couples. This meaning that has been engrafted on the meaning of the marriage institution. And the reason I'm missing it is exactly to send a message to people that they should be in these heterosexual marriages and not otherwise. No? No. Four of our messages that Nevada, we're talking Nevada here, wants to send to men and to women, this simple message, but powerful and life-transforming for both parents and children. If you're going to create a child and bring that child into this life, do it in a stable, committed relationship known as marriage, so that that child will have the benefits of the child's bonding right. And that is not the message of genderless marriage. If the message is you should bring a child into a relationship that's a committed marriage, then they ought to be allowed to marry, and then you'll be sending a message about those children. But let me ask you one thing. You were reading from Chief Justice Roberts? Yes. Was there a court of dissent? No. This was a statement he made at oral argument. And did he win on that argument? Or was he in a dissent at the end of the case? Nothing in any of the Windsor decisions suggests that his take on this was rejected by any of the justices. Or accepted by anybody except him. Well, I'm confident that Justice Alito accepted it, as I reread his decision. I would imagine so. His decision, of course. He has a majority view of the court. I mean, I have some views, too, but it's not worth much unless you get a few other judges. All right. Well, anyway, that's so much for Justice Roberts. I want to make this point. I want to make this point about adoption. Adoption statutes come into play only after. Only after. There's some failure in the child's bonding right in the life of a child. Only then do the adoption statutes come into play. Counsel, Judge Gould with a question. And I'm going to apologize if this is explicit in your briefing, and I just missed it. But where does the phrase bonding right get its derivation? You've stressed throughout your argument. I don't think it's in the Constitution Bill of Rights. And tell me, what's the first derivation of bonding right? That is a shorthand phrase that I just defined at the very beginning of my argument in the Idaho case. It's a shorthand phrase to refer to the powerful institutionalized message that goes out to everyone and that says, as a practical matter to heterosexual men and women, society expects of you, society looks to you to marry if you're going to create children because the child deserves that kind of a stable relationship and the ability to know. I think I understand. So I'm just using it. I'm not talking positive law. I'm not talking positive law. Although there are able people who have identified the child's bonding right in international human rights documents, and I'm referring to David Blankenhorn, I'm referring to Margaret Somerville, I'm using it here, though, only as, and I'm not disagreeing with their take on international human rights documents. I'm just using it here as a good shorthand phrase. There's an obligation side. There's a right side belonging to the child. There's an obligation side belonging or running against the parents. It's, Dad, you've got an obligation. You become a part of that child's life and the life of that child's mother in an enduring way. I think we've allowed you about double the time we were going to, but thank you very much. Thank you. Your Honors, that same-sex couples can now marry in 19 states and the District of Columbia does not mean that men who have children are told that they are unimportant in their marriages or that they are devalued in their marriages or devalued as parents. The only effect of this law is to devalue same-sex couples and their children. I want to pick up on a point that you asked Judge Rothbart just a moment ago, this question of where is this idea of fatherless families coming from? Where will these children come from? I think this is really difficult to understand because there is no way to think about the marriage ban as having any effect on who is a parent in Nevada. Take the married couples in this case. Let's just unwind this for a moment. Is it really an argument that these married couples will get divorced and then will search Las Vegas for different-sex couples to raise their children? There just is no effect here, and that's why under any level of review, this argument just can't sustain the marriage ban. Instead, as Windsor tells us, what the 14th Amendment cares about are the profound harms that this kind of message of devaluation sends to these children of the parents who are told that their families are second class. Picking up on a question from Judge Gould about the required level of scrutiny, indeed SmithKline controls. We submitted in our reply brief a chart on page 24, charting the way that the hallmarks of the analysis described in SmithKline really map precisely onto how the courts have analyzed sex-based discrimination. That's required here. Turning to another point that you raised, Judge Berzon, earlier about the Idaho argument about due process and equal protection, there is indeed an argument in this case, and this is an argument that the Fourth and the Tenth Circuits picked up, that there's another equal protection harm here, and that is discrimination with respect to the fundamental right. In fact, all of these core constitutional guarantees are violated, and the court should rule on all of them. And we can take a note from Windsor where Edie Windsor herself never raised a due process argument, and yet Justice Kennedy issued a decision recognizing that both core constitutional guarantees of equal protection and due process were violated. Turning just for a moment to Schutte, the reason that that case came out differently was that the court was examining a law that forbade the use of a classification, unlike in Windsor, which now tells us that when same-sex couples are excluded from marriage, that is indeed a targeted classification of them and their families for unequal treatment. Schutte doesn't mean that tomorrow voters in Virginia could reenact a ballot initiative that would ban interracial marriage. It didn't change Loving, and it wouldn't change Windsor. I also want to just turn a little bit to a question about — A very little bit. Thank you. Judge Berzon, I think you said a moment ago that SmithKline never tells us what the level of scrutiny is. And actually, before I talk about that, I should address a point that the intervener raised. The intervener, I think, tried to argue that SmithKline is really limited to cases of animus. But nobody believes that the lawyer who struck that juror, Duane Vordier, hated gay people or was motivated by bigotry. Cleburne, which talked about animus in these cases, all really reaffirmed that it isn't required. It's never been required, either for heightened scrutiny or to find an equal protection violation. But in Cleburne, it isn't as if the city council hated people with disabilities. JEB tells us the desire even to put women on a pedestal must be subjected to no less heightened scrutiny. And so it can't cabinet SmithKline in that way. In fact, SmithKline itself refers to Justice Kennedy's concurrence in Garrett that says that sometimes the courts reach a legal conclusion that voters or decision makers might have been motivated by insensitivity or a want of careful rational reflection. That's certainly what we have here. But it isn't necessary to find that to see that this law is plainly unconstitutional. Let's see. And I just want to check if there are any other questions from the Court. No, thank you. Thank you, Your Honors. No questions, sir. The case is argued. It will be submitted.
judges: REINHARDT, GOULD, BERZON